IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MICHELLE M. REAGAN | * |
| | * |
| v. | * Civil No. JFM-02-373 |
| | * |
| GORDON R. ENGLAND, SECRETARY | * |
| OF THE NAVY | * |
| | ***** |

MEMORANDUM

Plaintiff Michelle M. Reagan has brought this suit against Gordon R. England in his official capacity as Secretary of the Navy. Reagan alleges disability discrimination pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. England has filed a motion to dismiss for failure to state a claim or in the alternative for summary judgment. For the reasons stated below, the motion will be treated as one for summary judgment and will be granted.

I.

Beginning in 1993, Reagan was employed as a GS-7 budget analyst in the comptroller's office of the Naval Academy in Annapolis, Maryland. From almost the beginning of her employment, Reagan had difficulties working with her second-line supervisor, deputy comptroller Wendy Whitney.[1] On September 19, 1997, Reagan wrote an 11-page grievance to the Deputy of Management, Captain Donnelly. In this complaint, Reagan detailed numerous incidents which she believed led to low morale in her department and attributed the problems to Whitney whom she believed was the ringleader of a conspiracy to harass her by creating a hostile

---

[1] Whitney was previously known by her maiden name of Wendy Jernigan. Because the relevant events occurred while she went by the name Wendy Whitney, I will refer to her as "Whitney."

1

work environment. See Def.'s Ex. 1. Stating that she had been "a loyal and productive Federal employee for 19 years [who] wish[ed] to continue to contribute," Reagan requested that she "be reassigned outside the supervisory chain of the budget officer and the deputy comptroller." Id. at 162. Around that same time, Reagan also submitted a letter from Dr. William Tham who stated that Reagan would benefit from a move to a less stressful environment because stress was exacerbating physical problems she had been having. See Def.'s Ex. 24.

Instead of being reassigned, Reagan was "detailed" or temporarily assigned from the comptroller's office to the Writing Center. When this "detail" was scheduled to end in June of 1998, Reagan requested sick leave without pay to avoid returning to the comptroller's office. This request was denied by the comptroller on June 19, 1998 because Reagan had not provided proper medical documentation to support the approval of sick leave. See Def.'s Ex. 2. She was classified as absent without leave ("AWOL") until she provided such documentation. Id. On June 25, 1998, Reagan provided a letter from her treating psychologist, Dr. Richard M. Podolin. Podolin stated that Reagan was "psychologically unable to return to her job" but that she "continues to be able to tolerate alternative work demands appropriately." Def.'s Ex. 4. He concluded that "[d]ue to the circumstances that she encountered . . ., it is doubtful whether she will ever be able to return successfully" to the comptroller's office. Id. On July 16, 1998, Reagan's direct supervisor, Marge Burtis, notified Reagan that Podolin's letter was insufficient and that the Naval Academy required detailed information regarding her medical condition and her limitations so that it could properly assess her situation. Def.'s Ex. 3 at 71. Burtis requested that Reagan submit this information directly to the human resources department by July 31, 1998. Id. at 72. On August 4, 1998, this deadline was extended to August 7, 1998 at Reagan's request. Def.'s Ex. 5.

2

On August 5, 1998, Podolin sent another letter stating that he wanted to avoid releasing Reagan's entire chart due to "the confidential and personal nature of her medical record." See Def.'s Ex. 25. He explained that Reagan had been diagnosed with "296.32 - Major Depression Depressive Disorder Recurrent as well as 309.28 - Adjustment Disorder with mixed Anxiety and Depressed Mood secondary to the psychosocial stressors she encountered during her work in the Comptroller Department." Id. He noted that she "demonstrated a high level of adaptive occupational functioning during her detail to the Writing Center" and that in his opinion "she can continue productive employment if she is assigned to a different employment environment [other than the comptroller's office]." Id.

On August 17, 1998, Reagan wrote to Vice Admiral John Ryan, the superintendent of the Naval Academy. She reiterated her claims of a hostile work environment, including incidents that occurred since her 1997 grievance letter. Def.'s Ex. 6. She requested reassignment and restoration of her annual and sick leave, noting that she could not "endure any more hostility and intimidation." Id. at 165. On September 17, 1998, Ryan denied Reagan's request, stating that after investigation, there was no evidence to substantiate Reagan's allegation of a hostile work environment. Def.'s Ex. 7. Four days later, Reagan requested 30 days of advance sick leave from the Comptroller. Def.'s Ex. 8. This request was denied because there was "no expectation that [she planned] to return to duty at the end of [the] 30 day period." Def.'s Ex. 9. On September 26, 1998, the Navy sent Reagan a 30-day advance notice of proposed action to remove her from federal service. Reagan was removed from federal service on November 3, 1998 for being AWOL. See Def.'s Ex. 10.

Reagan appealed her removal to the Merit Systems Protection Board and the parties reached a "Negotiated Settlement Agreement" on May 28, 1999. See Def.'s Ex. 11. Under the

terms of the agreement, the Navy would, subject to Reagan passing a fitness for duty evaluation, inter alia, cancel Reagan's termination and reinstate her to her position as a budget analyst in the comptroller's office subject to a one-year trial period. Def.'s Ex. 11 at 108. During this trial period, Reagan agreed to "maintain regular work attendance" and "demonstrate compliance with all proper instructions as well as all applicable agency rules and regulations." Id. at 109. The agreement specified that if Reagan "fails to demonstrate regular and dependable attendance or engages in any other performance-related or conduct-related offense, including, but not limited to, any conduct deficiencies cited in the USNA Table of Disciplinary Penalties which would normally be punishable by a letter of reprimand or greater, the 03 November 1998 removal decision may be implemented." Id. In addition, Reagan also acknowledged that "her chain-of-command will be as follows: Marjorie Burtis, Budget Officer, Wendy Jurnigan Whitney, Deputy Comptroller, CDR Rodney Bryant, Comptroller, or their successors." Id. at 108.

Two weeks before she was supposed to return to work, Reagan requested that when she returned to the comptroller's office, Whitney have no contact with her and that she be assigned to an office abutting the offices of the comptroller with a co-worker of her choice. See Def.'s Ex. 12. This request was denied by the new Deputy for Management, Captain Robert Parsons. In a letter to Reagan on July 15, 1999, Parsons stated that "[a]lthough [the requested accommodations] may or may not prove therapeutically beneficial to your ability to efficiently perform your job, they are unreasonable accommodations and interfere with your supervisors' ability to do their jobs." Id. In the same letter, Parsons noted that Reagan had been found fit to return to duty and should report to work on July 19, 1999.[2]

---

[2] In Reagan's fitness for duty evaluation, Podolin diagnosed her as having "major Depression Recurrent-Moderate" and "problems related to her status and litgation with the

Reagan returned to work in mid-July and on July 30, 1999 an incident occurred which resulted in Reagan's termination. On that day, Reagan had a routine meeting with Burtis, her immediate supervisor, to review her duties and office policies. During the meeting, Burtis also raised the issue of Reagan playing solitaire on her computer at times other than her lunch half-hour. See Def.'s Ex. 17, Reagan Aff. at ¶ 1. Reagan believed that Burtis was harassing her at the instigation of Whitney so she got upset when Burtis raised this issue and left the office. Id. at ¶¶ 2-4. Reagan attempted to find the EEO office to file a complaint, but she could not find it because she "was so upset." Id. at ¶¶ 6-7. Instead, she went to the Human Resources Department (HRD) office to ask where the EEO office was located.

At the HRD office, Reagan found Shirley Smith who was the only employee in the office. Id. at ¶¶ 7-8. Smith and Reagan disagree about whether they had a conversation or went to find the EEO office (which was closed) first, but they agree that they ended up having a conversation in a conference room of the HRD office after Smith asked if Reagan needed to talk with someone. Id. at ¶¶ 9-10. During this conversation, Reagan was "crying very hard" and "was wailing and had [her] head on the table." Id. at ¶ 11. Reagan told Smith about her conversation with Burtis and that she wished to resign. Id. at ¶¶ 13-14. According to Reagan, she said to Smith: "I shouldn't have come back to the f------ Academy." Id. at ¶ 15. Reagan testified that she regrets this single use of profanity but "at the time [she] was uncontrollable and very unhappy." Id. She believed that she "was venting with [Smith] as a friend." Id. According to Smith, Reagan used profanity numerous times and despite the fact that Reagan did not explicitly

---

USNA." Def.'s Ex. 26 at 117. Podolin concluded that Reagan's current mental status was stable, but noted that she remained vulnerable if she had adverse interactions with Whitney. He recommended that accommodations be made to reduce interactions between them. Id. at 118.

threaten her, Smith felt personally threatened when Reagan stood up from the conference table in close proximity to her. See Def.'s 18, Def.'s Ex. 19, Smith Dep. at 60. Smith testified that in her 25 years as a personnel specialist, she had never before seen anyone "go off" like Reagan did that day. Def.'s Ex. 19, Smith Aff. at 60. When Reagan left the HRD office, Smith contacted her supervisor to let her know what happened.

After Reagan left the HRD office, she met with Parsons. Def.'s Ex. 13, Parsons Dep. at 50. Reagan briefly recounted her long-standing differences with Whitney and then told Parsons about her conversation with Burtis that day. Id. at 51. During the hour-long conversation, Reagan was "clearly very upset and she would at times yell and scream." Id. at 52. Reagan requested that Parsons assign her to another job away from Whitney, but Parsons believed that Reagan was out of control, so he would not discuss this with her. Id. at 53-56.

Over the next 10 days, Parsons investigated the events of July 30, 1999. He reviewed the accounts of Burtis and Smith and also had a meeting with Reagan and her attorney. On August 12, 1999, Parsons notified Reagan that he had decided to fire her. See Def.'s Ex. 21. He explained that after weighing the accounts of all participants, he found that Reagan had used "abusive and obscene language to and about other Naval Academy personnel numerous times" and that Reagan's "behavior and language were inappropriate, caused Ms. Smith to feel physically threatened, and cannot be condoned in the workplace." Id. at 135. He noted that pursuant to the negotiated settlement agreement, Reagan was serving a one-year probationary term and that her conduct "is an offense contained within the USNA Table of Disciplinary Penalties." Id. at 134-35. For these reasons, he decided to remove her from federal service. Id. at 135.

II.

In order to succeed in her claims of wrongful termination and failure to provide a reasonable accommodation, Reagan must establish that she is disabled within the meaning of the Rehabilitation Act. Rhoads v. Fed. Dep. Ins. Corp., 257 F.3d 373, 387 (4th Cir. 2001).[3] A person is disabled within the meaning of the Rehabilitation Act if the person has "a physical or mental impairment that substantially limits one or more major life activities." 29 U.S.C. § 705(9)(B). To be substantially limited in a major life activity, Reagan must be "[s]ignificantly restricted as to the condition, manner or duration under which [she] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. 1630.2(j)(1)(ii). Reagan claims that she is substantially limited in the major life activity of social interaction. England argues that the proper inquiry is whether Reagan is substantially limited in the major life activity of working.[4]

Based on the present record, Reagan is not substantially limited in the major life activity of working. "To show substantial limitations on her ability to work, [a person] must show, inter alia, that she is unable to work in a broad class of jobs; 'when the major life activity at issue is working, the inability to perform a particular job does not constitute a substantial limitation.'" Comber, 2000 WL 1481300, at * 3 (quoting Halperin v. Abacus Tech. Corp., 128 F.3d 191, 199

---

[3] Analysis under the ADA and the Rehabilitation Act are the same for purposes of deciding Reagan's claims. See Rhoads, 257 F.3d at 388 n.13.

[4] For purposes of this motion, I will assume that both working and social interaction are major life activities. See, e.g., Toyota Motor Manuf., Ky. Inc. v. Williams, 122 S. Ct. 681, 693 (2002) (assuming that working is a major life activity); Comber v. Prologue, Inc., 2000 WL 1481300, at * 6 (D. Md. 2000) (assuming that social interaction is a major life activity).

(4th Cir. 1997), <u>abrogated on other grounds by</u> <u>Baird ex rel. Baird v. Rose</u>, 192 F.3d 462 (4th Cir. 1999)). Further, "a personality conflict between an employee and a supervisor – even one that triggers the employee's depression – is not enough to establish that the employee is disabled, so long as the employee could still perform the job under a different supervisor." <u>Schneiker v. Fortis Ins. Co.</u>, 200 F.3d 1055, 1062 (7th Cir. 2000). Here, not only do Reagan and her psychologist claim that she could perform her current job if she is separated from Whitney, Reagan also claims that she could perform many other jobs. For this reason, Reagan is not substantially limited in her ability to work. <u>See</u> <u>Rhoads</u>, 257 F.3d at 388 (holding that plaintiff was not substantially limited in her ability to work when the only thing she established was that she was "unable to function in one particular smoke-infested office"); <u>Comber</u>, 2000 WL 1481300, at *3 (holding that plaintiff was not substantially limited in her ability to work when plaintiff claimed she could perform her old job "but for her troubled relationship with her former colleague"); <u>Kolpas v. G.D. Searle & Co.</u>, 959 F. Supp. 525, 530 (N.D. Ill. 1997) ("[M]erely not being able to work for particular individuals because of stress and anxiety is . . . not a substantial limitation on the major life activity of working.").

For similar reasons, Reagan's claim of being substantially limited in social interaction also must fail.[5] "Mere trouble getting along with co-workers is not sufficient to show a

---

[5] The Fourth Circuit recently held in <u>Rhoads</u> that when substantial limitations on major life activities other than working are triggered solely by the workplace environment, the proper disability inquiry is whether a person is substantially limited in their ability to work. 257 F.3d at 389. The only specific example in the present record of an environment that triggers the limitations on Reagan's ability to engage in social interaction is the Naval Academy comptroller's office. However, Dr. Podolin's testimony suggests that close family and friends who anger Reagan in her personal and social life may also trigger the limitations on Reagan's ability to engage in social interaction. <u>See</u> Pl.'s Ex. A, Podolin Decl. at ¶ 10. While this observation by Podolin is vague, I will consider it sufficient to justify considering Reagan's claim that she is substantially limited in social interaction.

substantial limitation [in social interaction] . . . . [A] plaintiff must show that his relations with others were characterized on a regular basis by severe problems, for example consistently high levels of hostility, social withdrawal, or failure to communicate when necessary." Lemire v. Silva, 104 F. Supp. 2d 80, 88 (D. Mass. 2000) (quoting McAlindin v. County of San Diego, 192 F.3d 1226, 1233 (9th Cir. 1999)). While Podolin does testify in general terms that Reagan's limitations on social interactions can be triggered by people other than Whitney, he does not offer any specific details based on his personal knowledge. More importantly, Reagan and Podolin both emphasize that Reagan was able to function well when she was detailed to the Writing Center. In addition, Reagan had worked for the federal government for twenty-two years and, based on the present record, she had never had a problem with social interactions in the workplace in the past. For these reasons, no reasonable jury could find that Reagan is substantially limited in the major life activity of social interaction.

### III.

In order to establish a prima facie case of retaliatory discharge, Reagan must establish that (1) she engaged in protected activity; (2) her employer took adverse employment action against her; and (3) a causal connection existed between the protected activity and the adverse action. Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). Reagan is able to establish a prima facie case; she made known her desire to file an EEO complaint, she was terminated and the close temporal proximity between the two establishes a causal connection. However, England has rebutted Reagan's prima facie case by articulating non-retaliatory reasons for Parsons' actions and Reagan has not proven that these reasons were pretext for retaliation. For this reason, England's motion for summary judgment will be granted. See id. (holding that when plaintiff does not prove that non-discriminatory reasons are pretext, she has not met her "ultimate burden

9

of proving retaliatory discharge").

Parsons' stated reason for firing Reagan was that she engaged in behavior that violated Naval Academy policies two weeks after she began a one-year probationary period. Under the terms of the negotiated settlement agreement which established the probationary period, Reagan could be fired if she committed any performance or conduct-related offense that was punishable by a letter of reprimand or greater. Further, Parsons credited the version of events recounted to him by Smith who he personally interviewed about the incident because Smith was a personnel specialist with many years of experience who was meeting with Reagan in the personnel office during business hours. She also was a disinterested third party with no connection to Reagan's claims of a conspiracy against her. See Def.'s Ex. 23, Parsons Aff. at 55. In addition, Smith's version of events was corroborated by Parsons' own observations of Reagan and Reagan's statement to him that she often lost her temper in the office and used profanity. Id.

In order to prove pretext, Reagan argues that the terms of her probation period allowed, but did not require, Parsons to fire her; that Parsons is not credible because he knew about Reagan's medical condition and disputes with Whitney but claimed he did not; and that another employee engaged in worse behavior than Reagan yet Parsons only suspended her for one week. None of these arguments proves that the legitimate reasons for Parsons' actions were pretext for discrimination. First, the negotiated settlement agreement left it to Parsons' discretion to determine whether Reagan's behavior merited her being fired. See Def.'s Ex. 11 at 109. It should not be up to a jury, as Reagan contends, to second-guess that decision and pass judgment on the merits of Reagan's actions. Second, even if Reagan were correct that Parsons knew more than he acknowledged regarding Reagan's medical history and disputes with Whitney, that is insufficient to discredit Parsons' stated reasons for his decision in light of the substantial

evidence in support of his testimony. Cf. Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989) ("[M]ere knowledge on the part of the employer that an employee it is about to fire has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee."). Finally, the limited information in the record regarding the incident that Reagan claims is comparable to her own is insufficient to find pretext. In that incident, a budget analyst that had no documented disability stated on two occasions that she was going to bring a gun to work and shoot her fellow employees. See Def.'s Ex. 22, Parsons' Aff. at 55. This employee was suspended for one week. Id. It is not possible to find that this incident proves pretext based on the minimal details in the current record. Unlike Reagan's case, there is no evidence that this employee was on probation, that she took physically inappropriate actions in the workplace or that she had on-going difficulties in her workplace relationships. All of these differences between Reagan and the other employee could justify the imposition of the lesser penalty.

    A separate order effecting the rulings made in this memorandum is being attached herewith.

Date: _September 4, 2002_

_/s/ J. Frederick Motz_
J. Frederick Motz
United States District Judge